*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

ANDREW PAUL SABATINE,

Plaintiff-Appellant,

v

COLLEEN KNECHT SABATINE,

Defendant-Appellee.

UNPUBLISHED
December 15, 2022

No. 361068
Leelanau Circuit Court
LC No. 2020-010532-DM

ANDREW PAUL SABATINE,

Plaintiff-Appellee,

v

COLLEEN KNECHT SABATINE,

Defendant-Appellant.

No. 361074
Leelanau Circuit Court
LC No. 2020-010532-DM

Before: SHAPIRO, P.J., and BORRELLO and YATES, JJ.

PER CURIAM.

In Docket No. 361068, plaintiff, Andrew Paul Sabatine, appeals as of right a judgment of divorce, specifically that portion of the judgment pertaining to custody of the minor children. In Docket No. 361074, defendant, Colleen Knecht Sabatine, appeals as of right the same judgment, specifically that portion of the judgment dealing with child-support calculations. In Docket No. 361074, we affirm. In Docket No. 361068, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

The parties were married on April 22, 2013, and had two girls together. During a majority of the marriage, the family lived together in Traverse City. Both plaintiff and defendant were in high-paying professions, although defendant chose to work far fewer hours than plaintiff, in order to care for the children. In September 2020, defendant abruptly moved the children to her parents'

-1-

home in Fenton, to be near defendant's family and childhood friends. She did not discuss the move with plaintiff ahead of time. Although the trial court was troubled by the way defendant handled the move to Fenton, it ultimately awarded primary physical custody to defendant, with liberal parenting time to plaintiff.

## I. DOCKET NO. 361068

Plaintiff contends that the trial court erred in analyzing several best-interests factors and argues that the custody decision should be overturned. He also takes issues with the court's findings regarding the girls' established custodial environment (ECE).

### A. STANDARDS OF REVIEW

MCL 722.28 states:

> To expedite the resolution of a child custody dispute by prompt and final adjudication, all orders and judgments of the circuit court shall be affirmed on appeal unless the trial judge made findings of fact against the great weight of evidence or committed a palpable abuse of discretion or a clear legal error on a major issue.

As stated by this Court in *Vodvarka v Grasmeyer*, 259 Mich App 499, 507-508; 675 NW2d 847 (2003):

> [This Court] appl[ies] three standards of review in custody cases. The great weight of the evidence standard applies to all findings of fact. A trial court's findings regarding the existence of an established custodial environment and regarding each custody factor should be affirmed unless the evidence clearly preponderates in the opposite direction. An abuse of discretion standard applies to the trial court's discretionary rulings such as custody decisions. Questions of law are reviewed for clear legal error. A trial court commits clear legal error when it incorrectly chooses, interprets, or applies the law. [Quotation marks and citations omitted.]

### B. BEST-INTERESTS FACTORS

MCL 722.23 states:

> As used in this act, "best interests of the child" means the sum total of the following factors to be considered, evaluated, and determined by the court:
>
> (a) The love, affection, and other emotional ties existing between the parties involved and the child.
>
> (b) The capacity and disposition of the parties involved to give the child love, affection, and guidance and to continue the education and raising of the child in his or her religion or creed, if any.

(c) The capacity and disposition of the parties involved to provide the child with food, clothing, medical care or other remedial care recognized and permitted under the laws of this state in place of medical care, and other material needs.

(d) The length of time the child has lived in a stable, satisfactory environment, and the desirability of maintaining continuity.

(e) The permanence, as a family unit, of the existing or proposed custodial home or homes.

(f) The moral fitness of the parties involved.

(g) The mental and physical health of the parties involved.

(h) The home, school, and community record of the child.

(i) The reasonable preference of the child, if the court considers the child to be of sufficient age to express preference.

(j) The willingness and ability of each of the parties to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent or the child and the parents. A court may not consider negatively for the purposes of this factor any reasonable action taken by a parent to protect a child or that parent from sexual assault or domestic violence by the child's other parent.

(k) Domestic violence, regardless of whether the violence was directed against or witnessed by the child.

(*l*) Any other factor considered by the court to be relevant to a particular child custody dispute.

Plaintiff argues that the court should not have concluded that defendant was favored with respect to factors (b) and (c) and instead should have concluded that the parties were equal. But the evidence did not clearly preponderate in the opposite direction with regard to these factors. *Vodvarka*, 259 Mich App at 507. Importantly, plaintiff himself stated that the couple had split the family duties based on their skills and that he handled finances and home maintenance and defendant primarily handled the medical and educational scheduling for the children. Defendant testified she had always "taken the lead" on "pretty much all aspects of the day-to-day life of the kids," including extracurricular activities. Defendant said that she was "involved and in charge of all the care of the kids" and would buy diapers and clothes for them, as well as groceries. She said that she did "all of their baths." She stated that it was difficult to get plaintiff to be involved in the girls' bedtime routines and that she would have to plead with him to read books for them. Defendant stated that sometimes plaintiff was "all into it" but other times was not. She averred that plaintiff had his own routine in the mornings and that she took care of the girls then. She stated that, one time when plaintiff had the girls overnight by himself because defendant had a family obligation, he expressed that it was too overwhelming for him and told her that he would not do it (i.e., care for the girls by himself, overnight) again.

-3-

The parties produced various family and friends to testify regarding each other's parenting abilities. From our review we glean that witnesses testified in accord with the party that called them to the stand. While testimony revealed that the parties have faults, it also revealed that both tried to be, and from the testimony were good parents. Hence, it is difficult to conclude that the evidence clearly preponderated in the opposition direction from the trial court's findings that defendant was favored under factors (b) and (c). Plaintiff contends that the trial court punished him for being the primary breadwinner and worker for the family. See, e.g., *Bofysil v Bofysil*, 332 Mich App 232, 246; 956 NW2d 544 (2020) ("Despite treating Bridget as a less viable parent because she chose to work outside the home, the court declined to credit Bridget for her ability and willingness to earn an income and provide health insurance for her child."). But the trial court expressly cited *Bofysil* and noted it was finding that defendant was favored for reasons other than her being with the children for more of the time than plaintiff. It stated that defendant took the lead on medical and educational issues *because of her educational background* and stated that even when the parties were together, she had a greater disposition to care for the children's needs. Testimony indicated that plaintiff took the lead on the children's care even when both parents were present in the home.

Plaintiff also argues that the trial court should not have credited defendant's testimony for factors (b) and (c) because, at another point in its opinion, the court concluded that defendant had offered testimony that was not credible. It is true that, at one point, the trial court stated that it did not find credible defendant's assertions that plaintiff was an "absentee father" and that she was essentially a "single parent." Instead, the trial court stated that the parties had different roles within the family but that both were "loving, concerned" parents. The trial court, as the finder of fact, was allowed to conclude that even though defendant exaggerated in some aspects of her testimony, she was credible in other aspects. Given the applicable standard of review, we discern no record evidence to serve as a basis for overturning the trial court's findings regarding factors (b) and (c).

Next, plaintiff argues that the trial court should not have found that the parties were equal with regard to factor (d) but instead should have found that plaintiff was favored. The children had a stable, satisfactory environment in the Traverse City home, where they lived since birth. Plaintiff relies on this fact in his argument on appeal, and for good reason: it certainly was a consideration for the trial court to consider. However, factor (d) refers to "[t]he length of time the child has lived in a stable, satisfactory *environment, and the desirability of maintaining continuity*[.]" MCL 722.23 (emphasis added). There was ample record evidence from which the trial court could find that the children were in a warm, loving atmosphere in Fenton. Defendant noted that the girls had known their grandparents' home in Fenton "as a place of stability, and fun times, and family." Also, and significantly, AS's therapist had moved her to a schedule with fewer appointments because AS was doing so well and was "consistently reporting happy with each session." Plaintiff speaks about the fact that defendant may be moving into a different home within walking distance of her parents' home in Fenton, but factor (d) speaks to the "environment," not just to the physical structure of a home. The evidence did not clearly preponderate in the opposite direction from the trial court's finding that the parties were equal on factor (d), because from all accounts the children would have been equally happy in *either* environment, even if the Fenton environment had been the girls' primary home base for a shorter period.

Next, plaintiff contends that the trial court erred by finding that defendant was slightly favored under factor (h) and that the court should have found that he was favored under it or that

the parties were equal with respect to it. In finding that defendant was slightly favored under this factor, the trial court emphasized that the children had more opportunities for socialization with friends and family—in essence, more of a "community"—in Fenton. The evidence did not clearly preponderate in the opposite direction from the trial court's finding. The Traverse City neighborhood did not contain many children and plaintiff said that the girls did a lot of activities with adults in Traverse City. Defendant stated that there were multiple children around the girls' ages who lived in the Fenton neighborhood. Defendant's grandfather lived nearby, as did her grandmother's sister and some cousins. Defendant had been scheduling playdates for the girls with their young cousins and young friends. Once again, a reversal of the trial court's finding regarding this factor is not warranted in light of the applicable standard of review.

Plaintiff next contends that the trial court should have made a finding under factor (*l*) and should have concluded that he was favored under this factor. He mentions defendant's greater ability to provide transportation. But the trial court took this into account by ordering that the exchange point be considerably closer to plaintiff's residence than to defendant's. He also contends that defendant violated a temporary January custody order but does not elaborate upon this contention. As stated in *Wilson v Taylor*, 457 Mich 232, 243; 577 NW2d 100 (1998):

> It is not sufficient for a party simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position. [Quotation marks and citation omitted.]

Here, plaintiff appears to be arguing that defendant violated the January order by enrolling the girls in schools in Fenton without his consent. But plaintiff also enrolled the girls in schools in Traverse City without defendant's consent, and no contempt order was issued in connection with defendant's actions. Plaintiff also, in connection with factor (*l*), mentions defendant's unilateral move to Fenton. But the trial court took this into account in its analysis of factor (j).

In her appeal, defendant attempts to argue that some of the best-interest factors should have favored her. However, In *Truel v City of Dearborn*, 291 Mich App 125; 804 NW2d 744 (2010), this Court stated, "Although an appellee need not file a cross-appeal to argue an alternative basis for affirming the trial court's decision, an appellee cannot obtain a decision more favorable than the decision rendered by the trial court." Defendant's arguments concerning the best-interests factors pertain to "alternative bas[e]s for affirming" the ultimate custody decision. *Id*. Defendant also argues, however, that there was no basis for plaintiff to even revisit the January 2021 temporary order or the referee's custody decision initially adopted by the court. By making this argument, defendant is seeking a decision "more favorable than the decision rendered by the trial court," *id*., because those earlier orders gave plaintiff fewer visitation rights than the order ultimately entered. Defendant has failed to file a cross-appeal, and consequently, her arguments in this latter regard need not be addressed.

## C. ESTABLISHED CUSTODIAL ENVIRONMENT

A parent seeking a custody change, to be successful, must show that the change is in the child's best interests. MCL 722.27(1)(c). MCL 722.27(1)(c) states, in part, "The court shall not modify or amend its previous judgments or orders or issue a new order so as to change the

established custodial environment of a child unless there is presented clear and convincing evidence that it is in the best interest of the child." The custody award in this case was a "new order" because the January temporary order was issued without an evidentiary hearing. See *Thompson v Thompson*, 261 Mich App 353, 359-363; 683 NW2d 250 (2004).

If a proposed change would not change the ECE, the parent seeking that change must "establish, by a preponderance of the evidence, that the change is in the child's best interests." See *Pierron v Pierron*, 486 Mich 81, 93; 782 NW2d 480 (2010), and *Shade v Wright*, 291 Mich App 17, 23; 805 NW2d 1 (2010). "If a child has an established custodial environment with both parents, neither parent's custody may be disrupted absent clear and convincing evidence that the change is in the child's best interest." *Bofysil*, 332 Mich App at 243.

The trial court in the present case applied a preponderance-of-the-evidence standard, indicating that the ECE was with both parents at all times and that "the [ECE] with both parents that existed before separat[ion] continues."

MCL 722.27(1)(c) explains that "[t]he custodial environment of a child is established if over an appreciable time the child naturally looks to the custodian in that environment for guidance, discipline, the necessities of life, and parental comfort." It adds that "[t]he age of the child, the physical environment, and the inclination of the custodian and the child as to permanency of the relationship shall also be considered." MCL 722.27(1)(c).

Defendant suggests that to determine the ECE, the court needed to look at the circumstances that existed after the move to Fenton. The *Bofysil* case is instructive on this point. In *Bofysil*, 332 Mich App at 236-237, Bridget and Sarah Bofysil lived together with their child near Ypsilanti. Sarah left and moved in with her parents in Montague, near Muskegon. *Id*. at 238. Also, "Bridget moved to Redford Township, more than two hours away from Sarah and [the child]. Bridget asserted that she could not move closer to Sarah's new home because she continued to work in Ypsilanti." *Id*. The trial court found that an ECE with Sarah existed, relying in part on the fact that the child had been mostly with Sarah since the separation. *Id*. at 239. Bridget argued, "in part, that the evidence established that [the child] had resided primarily with Sarah since the separation only because Sarah had withheld and alienated [the child] from her." *Id*. at 241. This Court stated, "The evidence preponderates against the circuit court's established-custodial-environment finding. Both parties agreed that from [the child's] January 2016 birth until Sarah left the home with [the child] in the middle of June 2018, both parents shared in the care of [the child]." *Id*. at 243. The importance of *Bofysil* is the Court's emphasis on the child-rearing situation before Sarah's departure. Similarly, then, what is important here is the child-rearing situation for the girls before defendant's departure. Ample evidence indicates that the ECE at that point was with both parents; the parties lived together as a family and both parents cared for the children.

The trial court concluded that its custody award would not change the ECE because the children would still be looking to both parents for guidance, discipline, comfort, and the necessities of life. However, caselaw indicates that even if this is the case, a drastic change in the number of overnights with a child effectuates a change in the ECE.

In *Lieberman v Orr*, 319 Mich App 68, 84; 900 NW2d 130 (2017), this Court explained that if a proposed parenting-time change "alters the established custodial environment, the

proposal is essentially a change in custody," and certain standards for revisiting a prior custody order as set forth in *Vodvarka* govern.[1] In *Lieberman*, *id*. at 73, the defendant mother had primary physical custody of the parties' two children, and the parties had joint legal custody. The parties had stipulated to a parenting-time schedule that gave plaintiff 140 overnights a year and defendant 225 overnights a year. *Id*. at 72. The plaintiff filed a motion to modify parenting time and change the children's schools. *Id*. at 74. He requested "essentially that the parties swap the current parenting time schedule." *Id*. (quotation marks omitted). The plaintiff argued that the parties had joint physical custody, that the swap would not materially change the amount of time the children spent in each home, and that "both parents would continue to share in providing love, support, and guidance of the minor children[.]" *Id*. at 75 (quotation marks omitted).

The defendant disagreed with the plaintiff's position that the parties had joint physical custody and disagreed with the plaintiff's position that the proposed change in parenting time would not materially change the amount of time the children would spend in each parent's household. *Id*. She argued that the plaintiff's proposed modifications would change the ECE and that his request was actually a motion to change custody, "notwithstanding its label[.]" *Id*.

The trial court agreed with the plaintiff's arguments. *Id*. It analyzed the best-interests factors of MCL 722.23 under the preponderance-of-the-evidence standard. *Id*. It granted the plaintiff's motion, ultimately awarding plaintiff 225 overnights a year and defendant 140 overnights a year. *Id*. This was an 85-night increase in the plaintiff's parenting time. *Id*.

This Court considered whether the trial court applied the proper standards to the plaintiff's motion, and it found that, despite the label the plaintiff had given to his motion, his "proposed modifications to parenting time effectively changed physical custody of the children from defendant to plaintiff." *Id*. at 85. It explained:

> The parties' judgment of divorce awarded legal custody to both parents, but physical custody of the children to defendant; the judgment did not award the parties joint physical custody. As noted, an award of physical custody primarily or solely to one party typically entails a situation in which the children receive physical care and supervision primarily from the parent awarded that status. That is the case here. In accordance with the parties' agreement that defendant would be the children's primary physical custodian, the children in the case at bar have resided with and been cared for and supervised primarily by defendant since entry of the judgment of divorce. Thus, it defies the plain meaning of the word "primary," as well as rudimentary mathematics, to say that reducing the primary custodian's overnights with the children from 225, or nearly 62% of the calendar year, to 140, or approximately 38% of the calendar year, does not change primary physical

---

[1] The standards relate to when "proper cause . . . or . . . change of circumstances" for revisiting a prior custody order exists. See MCL 722.27(1)(c). Such revisiting of a prior order is not at issue in the present case, which involved the initial determination of custody following an evidentiary hearing. See *Thompson v Thompson*, 261 Mich App 353, 359-363; 683 NW2d 250 (2004). However, the *Lieberman* decision is instructive on the issue of the ECE.

custody. By proposing a reduction in the number of overnights the children spend with defendant to a distinct minority of the year, plaintiff was proposing a change in custody, regardless of the label he gave his motion. Accordingly, the proper legal standard under which to review his motion was the more burdensome and restrictive standard set forth in *Vodvarka*. . . .

Even if we were to accept plaintiff's characterization of his motion as one simply to modify parenting time and change schools, *we nevertheless would hold that the trial court committed error requiring reversal by finding, against the great weight of the evidence, that plaintiff's proposed change would not affect the established custodial environment the children share with defendant* and by not analyzing the motion under the applicable legal framework set forth in *Vodvarka*. [*Lieberman*, 319 Mich App at 85-86 (footnotes omitted; emphasis added).]

The *Lieberman* Court stated that while "minor modifications that leave a party's parenting time essentially intact do not change a child's established custodial environment, significant changes do." *Id*. at 89-90 (citation omitted). Examples provided by the *Lieberman* Court of such significant changes include a substantial reduction in the amount of time a parent was to spend with a child, see *Rains v Rains*, 301 Mich App 313, 323-324; 836 NW2d 709 (2013), a modification that changed a parent equally active in a child's life to a "weekend parent," see *Powery v Wells*, 278 Mich App 526, 528; 752 NW2d 47 (2008), and a change from year-round near equality of parenting time to one parent having parenting time during the school year and the other having parenting time during the summer, see *Brown v Loveman*, 260 Mich App 576, 596; 680 NW2d 432 (2004). *Lieberman*, 319 Mich App at 90.

Moreover, in *Lieberman*, *id*. at 72, the "children . . . live[d] with defendant during the school year, and plaintiff received parenting time three weekends a month during the school year and all but the first and last weeks of the children's summer vacation." The defendant had 140 overnights and the plaintiff had 225. *Id*. The plaintiff sought to "swap" this schedule. *Id*. at 74. Significantly, the Court stated:

[C]entral to the children's established custodial environment with defendant was the support and guidance defendant gave and the material needs she met relative to the children's school attendance. *Plaintiff's proposed modification of parenting time would not only substantially reduce the time defendant would spend with the children, it would also change the character of her interaction with the children. Therefore, the proposal significantly alters the children's established custodial environment with defendant.* [*Id*. at 91-92 (emphasis added).]

While *Lieberman* was concerned with the issue regarding whether "proper cause . . . or . . . change of circumstances" for revisiting a prior custody order existed, see MCL 722.27(1)(c), we see no reason why its analysis *regarding the ECE* would not apply here. Both parents had the children for 365 overnights a year in Traverse City, and the custody order entered by the court was not only giving plaintiff significantly fewer overnights, it was also substantially changing the nature of his interaction with the children. Accordingly, the trial court should have applied a clear-and-convincing evidence standard, and a remand is warranted. Obviously, in most divorce situations, a child's overnights with a parent will *necessarily* be reduced or even halved, and such

-8-

changes will not necessarily amount to a change in the ECE.  But here, plaintiff is receiving substantially less than 50% of the parenting time and is becoming a weekend parent.  As stated in *Powery*, 278 Mich App at 528:

> Here, the evidence presented at the motion hearing showed that if plaintiff moved to Traverse City, either she or defendant would be relegated to the role of a "weekend" parent.  Conversely, when both parties lived in Ludington, they were equally active in their daughter's life.  Because any modification of "parenting time" based on this move *would amount to a change in the established custodial environment*, an "analysis under the best interest factor framework" was required.  Therefore, the trial court properly held an evidentiary hearing.  [Citation omitted.]

A remand is warranted so that the trial court can reassess its decision using the proper standard.

## II.  DOCKET NO. 361074

Defendant contends that the trial court made errors in computing the parties' incomes for purposes of calculating child support.

## A.  STANDARDS OF REVIEW

As this Court stated in *Peterson v Peterson*, 272 Mich App 511, 515-516; 727 NW2d 393 (2006):

> Child support orders and the modification of such orders are reviewed for an abuse of discretion.  Whether a trial court properly operated within the statutory framework relative to child support calculations and any deviation from the child support formula are reviewed de novo as questions of law.  [Citations omitted.]

But "factual findings of a trial court in a divorce case are to be reviewed for clear error." *Beason v Beason*, 435 Mich 791, 805; 460 NW2d 207 (1990).  Also, this Court "review[s] for an abuse of discretion a trial court's decision whether to impute income to a party." *Loutts v Loutts*, 298 Mich App 21, 25-26; 826 NW2d 152 (2012).

As summarized in *Ewald v Ewald*, 292 Mich App 706, 714-715; 810 NW2d 396 (2011):

> A trial court must presumptively follow the MCSF when determining the child support obligation of parents.  This Court reviews de novo as a question of law whether the trial court has properly applied the MCSF.  The trial court's factual findings underlying its determination regarding child support are reviewed for clear error.  The trial court's discretionary rulings permitted by statute and the MCSF are reviewed for an abuse of that discretion.  An abuse of discretion occurs when a court selects an outcome that is outside the range of reasonable and principled outcomes.  A trial court abuses its discretion when it relies on a legally improper reason for departing from the MCSF in establishing a parent's child support obligation.  [Citations omitted.]

The last issue raised by defendant on appeal involves a motion for reconsideration. "We review a trial court's decision on a motion for reconsideration for an abuse of discretion." *Woods v SLB Prop Mgt, LLC*, 277 Mich App 622, 629; 750 NW2d 228 (2008).

## B. CAPITAL GAINS

MCL 552.605(2) states, in pertinent part, "Except as otherwise provided in this section, the court shall order child support in an amount determined by application of the child support formula developed by the state friend of the court bureau as required in section 19 of the friend of the court act, MCL 552.519."

Defendant refers to the following provisions from the Michigan Child Support Formula (MCSF):

> 2.01(A) The term "net income" means all income minus the deductions and adjustments permitted by this manual. A parent's "net income" used to calculate support will not be the same as that person's take home pay, net taxable income, or similar terms that describe income for other purposes.

> 2.01(B) The objective of determining net income is to establish, as accurately as possible, how much money a parent should have available for support. All relevant aspects of a parent's financial status are open for consideration when determining support.

> 2.01(C) Income includes, but is not limited to, the following:

> * * *

> (6) Net capital gains are included as income. When attributable to a single event or year, or when cash may not be immediately available to the parent, consider them to the extent they can be used to represent income over several years. To the extent that a party proves that a portion of the capital gain was considered in the property division of the judgment of divorce between the parties, that portion should not be included as income.

> 2.01(H) Interest earned or potentially earned on inheritances and gifts (§2.05(B)) should be considered as income. Impute a reasonable rate when determining the potential investment return that could be earned. [2021 MCSF 2.01(A), (B), (C)(6), and (H).]

Defendant contends that the trial court erred by not considering plaintiff's inheritance money when calculating his income for purposes of child support. However, the record reveals that the trial court did take plaintiff's inheritance into account. Jason Bodmer, an income-assessment expert, was asked about "interest income, dividends and capital gains" related to "a number of Wells Fargo accounts." They were related to plaintiff's separate property. Bodmer took the income from these accounts into account when determining plaintiff's three-year average income for child-support purposes. The average total of the "interest income, dividend income,

and net capital gains was [approximately] $35,700" a year. He said that there was no need to impute any income on investments in this case because the amount was known. See 2021 MCSF 2.01(H). As evidenced by the record, the trial court *took the amount into account* when computing plaintiff's income.

Defendant also argues that the MCSF speaks of "net capital gains" as income, see 2021 MCSF 2.01(C)(6). She argues that the trial court should have included "unrealized" capital gains associated with the inheritances as part of plaintiff's income. But the financial experts clearly explained the nature of capital gains.

Chris Bott, defendant's expert, stated that plaintiff had had no realized capital gains for tax year 2020. He stated, "Unrealized gains, which would be representative of the growth and the value of the investments over their basis are not reported in a given year until there's a taxable event, i.e., they are sold." He indicated that unrealized capital gains fluctuate continually. The measurement date for the amount would be "the date that you sold it." And Bodmer stated:

> [C]apital gains do not include the change in value of capital assets. It seems silly to say this, but the very definition of a capital gain is such that a capital gain can only be realized if a . . . capital asset is sold for a gain. I say that because it would be impossible to assign income associated with a change in value of a capital asset and also include income associated with capital gains. Those two concepts are mutually exclusive, you can't include both, right? If you were to include both, you would in effect be double counting value.

Bodmer also said that "the change in value of an investment doesn't actually represent cash income" and is "not an amount that an individual has access to." He explained that "net capital gains" means "capital assets that are sold at a gain, as well as capital assets that are sold at a loss, the net number of those two." He said that one does not look at the beginning value of a brokerage account at a certain date and compare it to the value at another date and impute the difference as income, "because when the asset is actually sold it will trigger an actual capital gain, which would capture that change in value." Bodmer explained that it would be an "absolute nightmare" to try to continuously capture the value of a brokerage account and use it for imputation of income. He said that investment accounts "change in value constantly" and added:

> I don't think anybody would suggest that the individual should be paid back if their investment in Apple stock decreased in value. Rather the way it's handled in the child support formula is to capture the income when the asset is actually sold in the form of a capital gain or capital loss.

Bodmer explained that if one were to look at "unrealized capital gains in addition to net capital gains . . . you will by definition be capturing the same dollar point." He stated, "To include both would be such that you would be capturing the increase in value as it occurs and then recapturing it when they sell it." Importantly, he explained that "net capital gains . . . *by definition can only occur when a capital asset is sold for a gain*." (Emphasis added.) Bodmer explained that calculating unrealized gains would be nearly impossible because of the continuously changing nature of large numbers of "investments and equities." He further explained that the number on

-11-

an account pertaining to an unrealized capital gain referred to the gain over the entire life of the investment and was *not* an annual amount.

Given the commonsense notion of "capital gain" as testified to by the expert witnesses, the trial court properly concluded that no capital gains were to be included in plaintiff's income.

## C. CHANGE-IN-CONTROL PAYMENT

When plaintiff's company merged with another, he received a change-in-control payment (CICP) of $683,015.35. Defendant contends that the court should have taken this payment into account when calculating plaintiff's income for purposes of child support.

In *Loutts*, 298 Mich App at 26-31, this Court concluded that the lower court had discretion to impute income, for spousal-support purposes, in connection with a business whose value had been divided between the parties. In the present case, however, an income-producing business is not at issue. What is at issue is a *lump-sum payment*. Also, in *Loutts*, *id*. at 26, 29-31, the court had made the property division and had awarded one-half of the value of the company to each party, and this Court emphasized the wide discretion afforded the trial court in making its property-division and spousal-support awards. Here, the *mediation agreement* stated that plaintiff was taking the CICP, inclusive of company stock. Under the agreement, plaintiff, to balance the property-settlement monies, was to pay defendant $125,000 within seven days and an additional $400,000 within 90 days. "Property settlement provisions in a divorce judgment typically are final and cannot be modified by the court." *Baker v Baker*, 268 Mich App 578, 585-586; 710 NW2d 555 (2005). Nothing in the mediation agreement specifies that the CICP would be used to impute income for purposes of child support.

The trial court noted that if it were to impute income to plaintiff on the basis of the CICP, then it should logically impute income to defendant on the basis of the substantial amount of monies given to her by way of the property settlement.[2] The trial court's reasoning was sound and no abuse of discretion is apparent with regard to its conclusion that the CICP would not be used to increase the amount of plaintiff's income for purposes of child support. Thus, the trial court properly concluded that the parties had chosen to treat the CICP as an asset to be divided in the property settlement.

## D. DEFENDANT'S LIVING SITUATION

Under the MCSF, the court imputed $1,000 a month to defendant on the basis of savings associated with her living with her parents. See 2021 MCSF 2.05(C). Defendant contends that the trial court should have granted her motion for reconsideration and removed this imputation because she is no longer living with her parents.

---

[2] The court indicated that defendant had received $900,000.

The trial court, in denying the motion for consideration, stated, in pertinent part, that there was no record evidence that defendant was actually living on her own and no longer receiving free housing from her parents.

MCR 2.119(F)(3) states:

Generally, and without restricting the discretion of the court, a motion for rehearing or reconsideration which merely presents the same issues ruled on by the court, either expressly or by reasonable implication, will not be granted. *The moving party must demonstrate a palpable error by which the court and the parties have been misled and show that a different disposition of the motion must result from correction of the error*. [Emphasis added.]

In light of the record, which provides no proof of defendant living apart from her parents and paying for her own housing, defendant showed no palpable error in connection with the trial court's ruling.[3]

We affirm in Docket No. 361074. In Docket No. 361068, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion. We do not retain jurisdiction. No costs are awarded to either party. MCR 7.219(A).

/s/ Douglas B. Shapiro
/s/ Stephen L. Borrello
/s/ Christopher P. Yates

---

[3] We note that MCL 552.517 allows for review of child-support orders by the Friend of the Court.